### BRUNSON v. GEORGIA CHEMICAL WORKS.

(Circuit Court of Appeals, Fourth Circuit. July 8, 1916.)

#### No. 1451.

FRAUDULENT CONVEYANCES ☜300(1)—SUIT BY CREDITOR—EVIDENCE—SOURCE OF CONSIDERATION.

In a suit by creditor to subject to the payment of debts property conveyed by an insolvent debtor, uncontradicted evidence that the purchase price thereof was saved by grantee from her earnings and an inheritance, it appearing that the debtor had disposed of the great bulk of his property honestly, *held* not to warrant a decree setting aside deeds for fraud.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 896; Dec. Dig. ☜300(1).]

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Suit by Georgia Chemical Works against W. F. Cummings, the Carolina Land & Lumber Company, and Julia E. Brunson. Complaint dismissed as to respondent Carolina Land & Lumber Company. From a decree for complainant, respondent Julia E. Brunson appeals. Reversed, with directions.

S. G. Mayfield, of Denmark, S. C. (Mayfield & Free, of Bamberg, S. C., on the brief), for appellant.

Julian Mitchell, of Charleston, S. C. (Mitchell & Smith, of Charleston, S. C., on the brief), for appellee.

Before PRITCHARD and WOODS, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge. On January 5, 1916, the Georgia Chemical Works, complainant, filed its bill in equity in the District Court for the Eastern District of South Carolina against W. F. Cummings, the Carolina Land & Lumber Company, and Julia E. Brunson, defendants. The complainant's bill contains 17 sections which charge in substance that W. F. Cummings, until some time in the year 1913, owned and possessed a large amount of property, and was considered

one of the most responsible and wealthy men in Hampton county, with excellent credit; that on October —, 1912, said W. F. Cummings conveyed to Julia E. Brunson a tract of 225 acres of land for an alleged consideration of $1,300, but that the said conveyance was without consideration, and that deed of conveyance was not recorded until February 9, 1914; that in order to carry out a general scheme of fraud the said W. F. Cummings caused to be incorporated the Carolina Land & Lumber Company on August 27, 1913, with a capital of $50,000, with himself as president thereof, in order that he might convey to said corporation all of his property and get it beyond the reach of his creditors; that on September 20, 1913, Cummings conveyed to said corporation for an alleged consideration of $17,500 all his real estate, except 70 acres, worth about $700, but that said conveyance was without consideration, and was made to divest himself of all of his property and get it beyond the reach of his creditors; that on the 21st day of August, 1915, the Carolina Land & Lumber Company conveyed to Julia E. Brunson 220 acres of land for an alleged consideration of $3,000, but that said conveyance was in fact without any consideration, and though made by the Carolina Land & Lumber Company, was in fact the deed of W. F. Cummings, acting through the hand of the corporation in furtherance of his general scheme of fraud; that save and except the small parcel of land conveyed by the lumber company to Julia E. Brunson, the property all stood in the name of the Carolina Land & Lumber Company, but was in fact the property of W. F. Cummings. It thus appears that the complainants sought to subject to the payment of W. F. Cummings' debts large properties standing in the name of the Carolina Land & Lumber Company, and two small tracts of land standing in the name of Julia E. Brunson.

On the trial of the cause the District Court held that the allegations of fraud as to the Carolina Land & Lumber Company had not been sustained; that the conveyance by Cummings to the said corporation was upon fair consideration; was honest and in good faith. The complaint was dismissed as to the Carolina Land & Lumber Company. From this part of the decree there is no appeal, and the evidence touching that part of the transaction is not in the record. As to the two tracts of land conveyed to Julia E. Brunson, the court set aside the deeds on the ground of fraud and adjudged the property to belong to W. F. Cummings. The record does not show the witnesses examined touching the large transactions by and between Cummings and the Carolina Land & Lumber Company, except that W. F. Cummings was examined. What he said we do not know, but the court has found as a fact that there was no fraud in these transactions involving the transfer of practically all of his property. His explanation must have been satisfactory to the court. It is very remarkable, but the record does not show that Cummings was asked a question concerning the smaller transactions with Julia E. Brunson. Inasmuch as this case turns upon a question of fact, it is but fair to the District Judge that the evidence in the transcript of the record should be set out. It is as follows:

"The testimony of the defendant W. F. Cummings shows that on the 1st of January, 1913, as far as disclosed by the public records, he was possessed of both of the lots of land, the conveyances of which to Mrs. Brunson were set aside, and that he owned a great deal of other real and personal property, but disposed of all the real and personal property owned by him except the stock in a lumber road, all of which has been pledged, and he owed debts to a very large amount, and far in excess of the value of the two farms which were adjudged herein to be subject to his debts; that the husband of Mrs. Julia E. Brunson had been working for him for over 20 years, and lived in one of the operative's houses belonging to Cummings' sawmill, and his wages were $9.50 per week, and that every day when Cummings went to the mill, he took dinner at the Brunson's, and, if he stayed overnight, spent the night in their home."

We are unable to see in this statement any prima facie showing of fraud, or any circumstance that calls for explanation. If a deed was executed in October, 1912, and not recorded until February, 1914, of course the public records in meantime would show the land still in the grantor. That means nothing at all. The only testimony about the Brunsons is that Brunson had been working for Cummings for more than 20 years at $9.50 a week, and that every day when Cummings was at the sawmill, he took dinner at the Brunsons, and, if he stayed overnight, spent the night in their home. The District Judge says:

"It is difficult to conceive how Mrs. Brunson could have acquired this comparatively large amount of money in comparatively so short a time save by donations from Cummings. The evidence is sufficient to warrant the inference that only in this way could she have acquired it, and to require some sufficient definite explanation from her, and this explanation her testimony fails to make. Her testimony, so far from meeting the case, is most general, indefinite, and improbable, with apparent unwillingness to make a full discovery. She has had full opportunity to refute the inference and evidence the bona fides and justification of her purchase, and, in the opinion of the court, she has failed. The court is impelled to the conclusion that these deeds represent either voluntary donations from Cummings which are null and void as to his creditors, or were made to hinder, delay, and defraud the creditors."

Other than the statement above set out there were only two witnesses, Mrs. Brunson and the cashier of the Carolina Savings Bank, who produced the bank account of Mrs. Brunson in said bank. These witnesses were produced and sworn in behalf of the complainant. We set out from the testimony of Mrs. Brunson every question and answer that seemed to throw any light whatever on this transaction.

"Q. It was testified this morning your husband's salary is $9.50 a week. Did you do anything yourself? A. Why, certainly I did. Do you expect me to set down and not earn a living? Q. What did you do? A. I taken (took) in boarders and hired teams; also I raised stock more or less and sold it. I farmed and done different things to make money. Q. Where did you farm before you bought this place? A. I farmed other people's places. Q. You rented, you mean? A. Yes, sir. Q. Whom did you rent from? A. I rented the last few years from Mr. Cummings. Q. What place did you rent from Mr. Cummings? A. The Fechtig place. There I made a good crop. Q. You mean the place you bought from him? A. No, sir, I never bought that place, and I do not know that it is his land. I rented it from him. Q. This deed from Mr. W. F. Cummings to yourself, dated on the ———— day of October, 1912, was for a consideration of $1,300? A. Yes, sir. Q. Did you pay that $1,300 in a check or in cash, or how did you pay it? A. I paid it in cash, $400. Q. When was the balance paid? A. It was paid along from time to time as

I got the money, till 1912. Q. When was the first payment made on this land? A. Well, it was in 1908. Q. Did you give Mr. Cummings any kind of security at all when you went into possession of the place? A. Well, when I first bought the place, well I am an uneducated woman and know very little business, and I can hardly tell you how it was, but anyhow I paid $400 in 1908, and he was to make me a title and take a mortgage on the place, and I told him no, that I preferred paying from time to time until I paid for it. Till 1912 we have been paying for the place, when he gave us the title. Q. Have you been planting that place that you bought from Mr. Cummings or renting it? A. I have been renting it. Q. How much rent do you get a year for it? A. Well, I rented it, I think, 6 years for $75 a year, and the renter improved the place. Q. How much rent did you get in 1914? A. I got $75 and improvements. Q. Did you get it in cash or in cotton? A. I got it in cash. Q. And you had the same tenant there? A. For 6 years. Q. Was that the same tenant Mr. Cummings had there when he owned the place? A. If he ever had any there, I do not know it. Q. You put that tenant there after you got the place? A. Yes, sir. Q. I understand you started to pay on this place in 1908? A. Yes, sir. Q. When was the first year you rented it and got the $75? A. That must have been in 1908. Q. What was the name of that tenant? A. J. E. Anderson. Q. You talked of hiring teams; those teams belong to you or your husband? A. They belonged to my husband. Q. How many teams did he have? A. Had two. Q. How many horses? A. Had two horses and two buggies. Q. Did you have them as far back as 1911? A. I had them from, as well as I can remember, I had them from 1901. Q. And neither you nor your husband returned them for taxation? A. No, sir; I did not know it. Q. And during that time you bought a lot in the town of Hampton, did you not? A. Yes, sir; I bought a lot in Hampton; I don't know the exact time. Q. About 1910, was it not? A. I do not know. Q. From whom did you buy it? A. I bought it from W. T. Johns. Q. What did you pay him? A. I gave him a check on the Charleston bank for it. Q. What bank in Charleston have you an account in? A. More than one bank in Charleston. I don't see why you should want to know that; not going to tell you. (Mr. Michell asked the master to instruct the witness to answer the question.)

"Witness: This check was given on the Carolina Savings Bank.

"Q. And how much did you pay Johns for that land? A. Well, that is none of your business.

"The Court: You will have to answer the question.

"Witness: I paid him a thousand dollars for it.

"Q. Where did you get the thousand dollars you paid? A. That don't make any difference to you where I got it.

"Q. Do you decline to say where you got it? A. That don't make any difference. Q. Did you get it from Mr. Cummings? A. No, I positively did not. Q. What suggested to you opening an account in the Carolina Savings Bank? A. Because I heard citizens of Hampton, S. C., say it was the best bank in the world, and so that is why I put my savings there. Q. Did you keep any bank account at Hampton at all? A. Very little. Q. What bank in Hampton did you keep your money in? A. Bank of Hampton. Q. In 1915 you bought the other farm, what did you pay for it? A. I paid $3,000 for it. Q. Did you pay cash or check? A. Check. Q. On Carolina Savings Bank? A. Yes, sir. Q. Where did the money come from to pay the $3,000? Did you make that keeping horses? A. Well, I made it in different ways. My husband worked, I worked, and we saved what little we could along until we saved it. I think we ought to save up something; we have been married 24 years. If people don't save anything by that time, they never will. Q. You have a family to support, have you not? A. Yes, sir. Q. How many children have you? A. Three. Q. This money you had in the Carolina Savings Bank, was that the accumulation of small amounts been going on for some time? A. Well, some of it was, until the last time I sent money there I sent a big amount; I sent $1,000. Q. That was just before you bought this land from the Carolina Land & Lumber Company, was it not? A. Yes, sir; not very long before I bought it. Q. Where did that thousand dollars come from? A.

Well, I got some of it from my mother's estate, and I got some of it from J. E. Anderson, and some from S. F. Crew. Q. You mean you borrowed it? A. Well, they were owing it to me, and my mother she died, and I got some from her estate. Q. What did Crew and the other party you mentioned, for what did they owe you the money? A. Well, Mr. Crew, owed me—I don't feel disposed to tell you anything like that—but he owed me for a piano. Q. Did you have any account in Charleston outside of the Carolina Savings Bank? A. No, sir; I did not have any at all. Q. How would you make these deposits in the Carolina Savings Bank; did you come here and deposit the money? A. No, sir; I never was here in my life until I came down now. Sometimes I would send it and sometimes I would send a check, and now and then Mr. Cummings was going down and I would send it by him. Q. Mr. Cummings would make the deposits? A. Yes, sir; off and on, if he was going. There was not much saved, but every little that was saved was a help."

The testimony shows that Mrs. Brunson was an uneducated woman who had never been in a courthouse in her life until she testified in this case. Instead of her testimony being evasive or unsatisfactory, it seems to be very reasonable and truthful. It is true that once or twice she did not seem to want to answer the question, evidently because she could not understand why a lawyer wanted to ask her about her affairs, and she could not see the relevancy of the questions to the case. But in every instance when the court told her to answer the question, she answered promptly, and, what is more, answered truthfully. She tells the court that she worked, kept boarders, farmed, raised stock, and hired teams. Not a witness was put on the stand to show that she did not keep a boarding house, or that she did not hire teams, or that she did not farm, or that she did not raise stock. She tells the court that she went into the possession of the first tract of 225 acres of land in 1908 and rented it for $75 a year and improvements, and that J. E. Anderson was her tenant. She gave names and dates and stated tangible, visible facts, and if this testimony was not true, it was in the power of the complainant to show that it was not true. He did not offer a word of testimony to contradict it. She told how she made her money, and with that testimony uncontradicted, it is hard to see how the court can find that she had no money unless it was a donation from Cummings. When she was asked about the savings account in Charleston, she was asked if this account represented the accumulation of small savings for a long time, and she answered that it did, but that at one time she sent a big sum; that she sent a thousand dollars. When asked where she got the thousand dollars, she answered that she got it from J. E. Anderson, S. F. Crew, and her mother's estate. When asked what S. F. Crew owed her for, she said he owed her for a piano. Here again is a statement giving names and the sources from which she got a thousand dollars which she sent to the Carolina Savings Bank. If this testimony was false, the complainant should have shown that Crew did not owe her for a piano, or that Anderson did not owe her, or that her mother did not leave her any estate. No witness has testified that Cummings ever gave Mrs. Brunson any property or money whatever, and there is no circumstance in this case from which such an inference can be drawn.

Attention should be called to the fact that Mrs. Brunson's bank account was introduced by the complainant. Mrs. Brunson had been

examined and had gone home. She did not know that the bank account would be introduced, and it is not probable that she had the remotest idea how a sheet from a bank book would look or what it would show. The bank sheet, though mute, is eloquent and convincing proof of the thrift of Julia E. Brunson. During the life of the account of more than 8 years there were 63 credit entries, and she drew only two checks, and in each instance the check was drawn to make a wise, permanent, real estate investment. From June 25, 1907, to January, 1909, she made no deposit. That circumstance corroborates her testimony that in 1908 she bought the land from Cummings and paid him $400 in cash the first time. Evidently the savings from 1907 until 1909 were paid to Cummings on the land purchase. Cummings being a constant visitor, it was perfectly natural for her to pay him the actual cash as she saved it from keeping boarders, hiring teams, and so forth. The truthfulness of Mrs. Brunson's testimony, corroborated in so many particulars by the bank sheet, stands out like a mountain peak. An analysis of her testimony shows that it was not vague, indefinite, and improbable, but it is clear, definite, reasonable, convincing, truthful. The learned District Judge said that Mrs. Brunson bought $5,300 worth of property in the short space of 3 years. He is in error. The bank account was opened June 25, 1907, by a deposit of $500 and the last deed was executed on August 21, 1915, more than 8 years thereafter. The testimony further shows that she purchased and went into the possession of the Cummings tract of land in 1908, and made a payment of $400 thereon. But even if we take the narrow view that the purchases must be considered as of the date of the title deeds, the District Court was in error. The deed from Johns was dated November 1, 1910, and the deed from the Carolina Land & Lumber Company August 21, 1915, 4 years and 10 months thereafter. In Mrs. Brunson's examination she said she paid Johns a thousand dollars for the lot at Hampton and gave a check on the Carolina Savings Bank. The bank sheet corroborates her. She said when she bought the land from the Carolina Land & Lumber Company she gave a check for $3,000. Again the bank sheet shows that her testimony was true. She said the account was made up of savings for a long time, except that at one time she sent a thousand dollars, which she explained came from her mother's estate, from J. E. Anderson, and S. F. Crew. The bank sheet shows the big deposit of $1,000 about which she testified.

If there is any circumstance in this case from which it could even be suspected that Cummings ever gave Mrs Brunson any money, it is the fact that the bank sheet shows that certain deposits were made by Cummings. The fact that one person steps into a bank and makes a deposit of money in the name of a friend or neighbor certainly furnishes no evidence that the deposit is a donation. Look at the record for a moment:

"Q. How would you make these deposits in the Carolina Savings Bank? Did you come and deposit the money? A. No, sir; I never was here in my life until I came down now. Sometimes I would send it, and sometimes I would send a check, and now and then Mr. Cummings would go down and I would

send it by him. Q. Mr. Cummings would make the deposit? A. Yes, sir; off and on, if he was going."

The bank sheet shows that 26 deposits were made from June 25, 1907, until August 20, 1915, when she bought the tract of land from the lumber company. Of these deposits 23 were sent by mail and 3 by Cummings. Again the bank sheet corroborates Mrs. Brunson. She was asked on her examination particularly about the thousand dollars deposit which appears to have been sent down by Cummings, and she explained the sources from which she got the money. She was not asked about the other deposits. No doubt if she had been, she would have explained.

Let us analyze these deposits made by Cummings. One was for $500, made June 25, 1907. That was more than 8 years before Mrs. Brunson purchased the land, which has been taken from her on the ground of fraud. Did one of the wealthiest and most responsible citizens of Hampton county, with excellent credit, who so continued until some time in the year 1913, as far back as June, 1907, give to Julia E. Brunson the sum of $500 in order, more than 8 years thereafter, to defraud his creditors? There is not a scintilla of evidence that he gave her the money, nor is there one scintilla of evidence he owed a dollar at that time, or within 6 years thereafter. The next deposit made by Cummings was on January 8, 1913, for $40. Does that indicate that this wealthy and responsible citizen was depositing his money in the name of somebody else in order to defraud his creditors, or does it corroborate the testimony of the hard-working Julia E. Brunson, who said that sometimes she sent the money by Mr. Cummings? The question admits of but one answer: Why suggest fraud when every circumstance bears out the truthfulness, as well as the reasonableness, of this woman's testimony?

There is not a word of testimony to impeach the deed of October, 1912. It was not recorded until February 9, 1914. The circumstance that it was not recorded negatives the idea of fraud, because if this wealthy and responsible, and evidently intelligent, citizen of Hampton county was preparing to get his land beyond the reach of his creditors, he would have seen to it that the deed was recorded.

Only one other circumstance will be referred to, and that is the remarkable, inexplicable fact that W. F. Cummings is declared by the District Court to have honestly disposed of the great bulk of his property which made him one of the wealthiest men in Hampton county, but as to a mere pittance of it he has been guilty of fraud. It is hard to believe that a man of character and standing, in the heyday of his prosperity and wealth, committed a fraud as to an infinitesimal part of his property, and thereafter, when misfortune overtook him, disposed of his great and extensive possessions honestly and for the benefit of his creditors. Fraud will not be presumed. The evidence in this case does not prove it. So much of the decree of the District Court as sets aside the deed of W. F. Cummings to Julia E. Brunson, dated October —, 1912, for fraud, and so much thereof as sets aside the deed of the Carolina Land & Lumber Company to Julia E. Brunson, dated August 21, 1915, for fraud, is re-

versed. The complaint as to Julia E. Brunson is retained for the sole purpose of ascertaining what creditors, if any, of W. F. Cummings have claims on the land conveyed in October, 1912, by reason of the failure to record the deed until February 9, 1914. Such creditors, after exhausting their remedies against the property of W. F. Cummings, will be entitled to subject such land to their debts. In all other respects the decree as to Julia E. Brunson is reversed, with costs.

Reversed.

WOODS, Circuit Judge (concurring). I concur in the result. The direct testimony, the circumstances of the parties, and the manner in which Mrs. Brunson testified, are enough to produce a strong suspicion that Cummings deposited from his own funds at least the chief credits on the bank account of Mrs. Brunson, and that such consideration as was paid for the conveyances of the land to Mrs. Brunson was furnished by Cummings. I do not think, however, that the plaintiff has sustained the burden of proving the fraud alleged by the preponderance of the evidence.